UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Madeline Cox Arleo |
| v. | Mag. No. 13-8013 (MCA) |
| BABAR QURESHI, <br> MUHAMMAD SHAFIQ, <br> IJAZ BUTT, <br> QAISER KHAN, <br> SHAFIQUE AHMED, <br> HABIB CHAUDHRY, <br> RAGHBIR SINGH, <br> MUHAMMAD NAVEED, <br> KHAWAJA IKRAM, <br> NASREEN AKHTAR, <br> MOHAMMAD KHAN, <br> AZHAR IKRAM, <br> SHAHID RAZA, <br>     a/k/a "Abid Mian," <br> VERNINA ADAMS, <br> SAT VERMA, <br> VIJAY VERMA, <br> TARSEM LAL and <br> VINOD DADLANI | **CRIMINAL COMPLAINT** |

I, James Simpson, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

James Simpson, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
February 4, 2013 at Newark, New Jersey

HONORABLE MADELINE COX ARLEO
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

From in or about 2003 through the present, in the District of New Jersey, and elsewhere, defendants

BABAR QURESHI,
MUHAMMAD SHAFIQ,
IJAZ BUTT,
QAISER KHAN,
SHAFIQUE AHMED,
HABIB CHAUDHRY,
RAGHBIR SINGH,
MUHAMMAD NAVEED,
KHAWAJA IKRAM,
NASREEN AKHTAR,
MOHAMMAD KHAN,
AZHAR IKRAM,
SHAHID RAZA,
a/k/a "Abid Mian,"
VERNINA ADAMS,
SAT VERMA,
VIJAY VERMA,
TARSEM LAL and
VINOD DADLANI

did knowingly and intentionally conspire and agree with each other and others to devise a scheme and artifice to defraud financial institutions, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, those financial institutions, by means of false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

ATTACHMENT B

I, James Simpson, a Special Agent with the Federal Bureau of Investigation ("FBI"), have knowledge of the following facts based upon: (a) my investigation, (b) discussions with witnesses and other law enforcement agents, (c) review of over 1,100 bank accounts; and (d) searches of e-mail accounts, residences, offices, and drop addresses. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause.

1. The defendants named in this Complaint, along with other, uncharged co-conspirators (collectively, the "Co-Conspirators") are part of a massive international fraud enterprise (the "Fraud Enterprise") involving thousands of false identities, fraudulent identification documents, doctored credit reports, and more than $200 million in confirmed losses from commercial and business frauds.[1]

## Overview of the Fraud Enterprise

2. At the heart of the Fraud Enterprise is a scheme that was repeated thousands of times to create more than 7,000 false identities and steal hundreds of millions of dollars. The scheme—used to commit numerous frauds, including credit card fraud—involved a three step process:

    **Make up**: First, the defendants would "make up" a false identity by creating fraudulent identification documents and a fraudulent credit profile with the major credit bureaus.

    **Pump up**: Second, the defendants would "pump up" the credit of the false identity by providing false information about that identity's creditworthiness to the credit bureaus. Believing the furnished information to be accurate, the credit bureaus would unwittingly incorporate this material into the false identity's credit report, making it appear that the false identity had excellent credit.

    **Run up**: Third, the defendants would "run up" large loans using the false identity. The higher the fraudulent credit score, the larger the loans that the defendants could obtain. These loans were never repaid, and the defendants reaped the profits.

---

[1] The Fraud Enterprise spanned at least 8 countries, including Pakistan, India, the United Arab Emirates, Canada, Romania, China, Japan and the United States, and at least 28 states, including Alabama, Arizona, California, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Utah, Vermont, Virginia, Washington and Wisconsin.

2

3. To operate a criminal enterprise of this size and scope, the Co-Conspirators and others constructed an elaborate network of false identities. Across the country, Co-Conspirators and others maintained over 1,800 "drop addresses," including houses, apartments, and post office boxes which they used as the mailing addresses of the false identities.

4. The Co-Conspirators also created dozens of sham companies that did little or no legitimate business (the "Sham Companies"), obtained credit card terminals for the Sham Companies, and then ran up charges on the fraudulently obtained credit cards. To accept payments in the form of credit cards, a business must establish a merchant account with an entity known as a merchant processor. The merchant processor provides the business with equipment to process credit cards, receives payments from credit card companies for credit cards run at the business, and deposits those payments, minus a fee, into the business' bank account. When the merchant processors shut down accounts operated by the Co-Conspirators for fraud, the Co-Conspirators would apply for new terminals and create new companies.

5. The Sham Companies also served as "furnishers," providing the credit bureaus with false information about the credit history of numerous false identities, who purportedly worked at or owned many of the Sham Companies.

### Profits and Losses

6. Defendants profited handsomely from the Fraud Enterprise. They used the proceeds of the crime to purchase luxury automobiles, electronics, spa treatments, high-end clothing and millions of dollars in gold. Members of the Fraud Enterprise also stock-piled large sums of cash. In one instance, law enforcement discovered approximately $68,000 in cash in the kitchen oven of one member of the Fraud Enterprise. Due to the massive scope of the fraud, which involved over 25,000 fraudulent credit cards, loss calculations are ongoing and final confirmed losses may grow substantially above the present confirmed losses of more than $200 million.

7. Records of the New York and New Jersey Departments of Labor reveal that many of the Co-Conspirators have no reported legitimate employment in the last five years, including BABAR QURESHI, MUHAMMAD SHAFIQ, IJAZ BUTT, QAISER KHAN, SHAFIQUE AHMED, MUHAMMAD NAVEED, KHAWAJA IKRAM and NASREEN AKHTAR. The bank accounts and purchases of these individuals, however, tell a far different story. For example, as recently as September of 2012, BABAR QURESHI made a wire transfer of $500,000. In addition, since 2005 over $1 million has flowed through just one of BABAR QURESHI's many personal bank accounts. More than $750,000 has flowed through one of SHAFIQUE AHMED's personal bank accounts since June of 2007 and more than $450,000 has flowed through one of IJAZ BUTT's personal bank accounts since 2006.

8. The profits from the conspiracy did not go to only a few individuals, but supported a massive network of co-conspirators over a period of several years. This complaint charges only the top members of the Fraud Enterprise and there remain numerous individuals involved in the Fraud Enterprise not charged here. In addition, millions of dollars were spent on sustaining

the elaborate network of drop addresses and running credit reports on the thousands of false identities. An analysis of over 169 bank accounts of the defendants, Sham Companies, and complicit businesses has identified over $60 million dollars in proceeds from the Fraud Enterprise that flowed through the accounts, much of it withdrawn in cash. Millions of dollars were also wired overseas to Pakistan, India, the United Arab Emirates, Canada, Romania, China and Japan by the Co-Conspirators.

## Defendant's Roles

9. BABAR QURESHI and MUHAMMAD SHAFIQ are leaders of the Fraud Enterprise.

10. IJAZ BUTT, QAISER KHAN, SHAFIQUE AHMED, HABIB CHAUDHRY, RAGHBIR SINGH, MUHAMMAD NAVEED, KHAWAJA IKRAM, NASREEN AKHTAR, MOHAMMAD KHAN, AZHAR IKRAM and SHAHID RAZA work under BABAR QURESHI and MUHAMMAD SHAFIQ.

11. VERNINA ADAMS assisted in "pumping up" or inflating the credit of the false identities through manipulation of credit reports.

12. SAT VERMA, VIJAY VERMA, TARSEM LAL and VINOD DADLANI ran complicit jewelry stores where millions of dollars in fraudulent credit card transactions were processed.

## The Fraud Enterprise

### Step 1: Make Up False Identities

13. The Co-Conspirators created and maintained thousands of false identities to further the conspiracy. In some instances, all information about the identity was fabricated. In other instances, while the social security number used by the false identity matched someone with the same name, the identification documents that were created for the identity were entirely fraudulent.

14. One method through which the Co-Conspirators created certain false identities was by adding a fictitious person as an "authorized user" on an existing credit card. In some instances, certain Co-Conspirators, including HABIB CHAUDHRY, RAGHBIR SINGH and AZHAR IKRAM, added false identities as authorized users on their own credit cards. In other instances, Co-Conspirators purchased "authorized user tradelines" (discussed below) from individuals such as VERNINA ADAMS. Once an identity was added as an "authorized user," the major credit reporting agencies created a credit profile for the identity.

15. The Co-Conspirators created other false identities by making up information about the false identities, including personal identifying information such as social security numbers, fraudulent identification documents, fraudulent pay stubs and fraudulent tax returns. Certain Co-Conspirators, including BABAR QURESHI, MUHAMMAD SHAFIQUE, IJAZ BUTT, QAISER KHAN, SHAFIQUE AHMED, KHAWAJA IKRAM, NASREEN AKHTAR,

MOHAMMAD KHAN, AZHAR IKRAM, SHAHID RAZA and VERNINA ADAMS, then communicated these fraudulent documents to one another via email and text messages.

### Step 2: Pump Up the False Identities' Credit

16. After creating certain false identities, the Co-Conspirators improved their credit history through a variety of methods. For example, the Co-Conspirators applied for and received credit cards with low spending limits. Then, the Co-Conspirators made a series of small purchases over an extended period of time and paid off the credit cards. This slowly increased the credit score of the false identities. Members of the conspiracy, including BABAR QURESHI, RAGHBIR SINGH, MUHAMMAD NAVEED, KHAWAJA IKRAM, NASREEN AKHTAR and AZHAR IKRAM, have been recorded in bank branches making payments and ATM withdrawals on behalf of false identities used by the Fraud Enterprise.

### Tradelines

17. The Co-Conspirators also used fraudulent "tradelines" to improve the credit histories of the false identities. Co-Conspirator VERNINA ADAMS and others used both "primary tradelines" and "authorized user tradelines" in furtherance of the conspiracy.

    a. A primary tradeline is a line of credit in a credit history. Primary tradelines in good standing improve the credit score of the holder of the line of credit. Both the size of the line of credit and the length of time it has been in good standing impact the credit score. A primary tradeline has a significant influence on increasing or decreasing a credit score.

    b. VERNINA ADAMS, through her business "One Stop Credit Shop," enabled the Fraud Enterprise to post primary tradelines on the credit histories of false identities for lines of credit that did not in fact exist. Other Co-Conspirators contacted VERNINA ADAMS, who then obtained fake lines of credit for the false identities connected to the Fraud Enterprise to help improve the credit score of the false identity.

    c. An authorized user tradeline is a term used by credit reporting bureaus to refer to a person being an authorized user on someone else's credit card. This can raise the credit score of the added authorized user because the authorized user inherits a portion of the credit history of the primary user of the credit card.

    d. VERNINA ADAMS sold authorized user tradelines to other Co-Conspirators. In turn, the other Co-Conspirators used the authorized user tradelines to create new identities for use in the Fraud Enterprise and to improve credit scores.

18. VERNINA ADAMS communicated with other Co-Conspirators by email to arrange for the manipulation of false identities' credit history. Several examples of their communications follow:

a.  On or about February 10, 2011 VERNINA ADAMS emailed a Co-Conspirator ("CC-1") to advertise several primary tradelines she was offering for sale (the "February 10 Email"). In the February 10 Email, VERNINA ADAMS referenced a "credit profile number" or "CPN." A CPN is a number that is formatted like a social security number and checked to ensure that a record does not exist with the credit bureaus for that number. CPNs are used by the Fraud Enterprise as the social security numbers for false identities to ensure that the credit bureaus do not reject the identity because a credit profile already exists with the same social security number. Additionally, in the February 10 Email, VERNINA ADAMS noted that the tradelines she was offering for sale would be backdated to November of 2009, making it falsely appear that the line of credit had existed for several years. This would improve the credit score of the false identity.

b.  On or about April 12 and 13 of 2011, VERNINA ADAMS instructed CC-1 that a false identity must have a California address to purchase a primary tradeline. Law enforcement has determined that one of the companies that VERNINA ADAMS used to fraudulently post false primary tradelines to the credit history of false identities was a complicit California business called Acapulco Jewelry. CC-1 responded that his "client" did not have a California address, but rather had a New York address. VERNINA ADAMS agreed to make up a California address for the "client."

c.  On or about May 31, 2011, and June 1, 2011, CC-1 placed an order to purchase a primary tradeline for approximately $600 by filling out an online form on VERNINA ADAMS website. VERNINA ADAMS then emailed CC-1 to ask if the primary tradeline had posted to the credit bureaus. CC-1 responded that it had posted. VERNINA ADAMS responded that the primary tradeline should have posted only to Equifax and stated it was the Acapulco jewelry line.

d.  Law enforcement has determined that VERNINA ADAMS also offered a fraudulent service called "credit card sweep." VERNINA ADAMS offered this service as a method to repair the credit of a false identity, after it had run up fraudulent loans, by claiming that the false identity was a victim of identity theft. The credit card sweep scam sometimes involved submission of false police reports to substantiate the claims of identity theft.

e.  On or about June 20, 2011, VERNINA ADAMS and CC-1 communicated via email regarding the purchase of a "credit card sweep" for a false identity controlled by the Fraud Enterprise. CC-1 stated that CC-1 needed a Pennsylvania driver's license for the false identity and had the photo available. VERNINA ADAMS responded that she was no longer doing credit sweeps and directed CC-1 to a website that sold false identification documents to purchase the phony driver's license he referenced in his email.

### Step 3: <u>Run Up Loans using the False Identities</u>

19. Once the defendants made up an identity and pumped up the identity's credit, they ran up large loans using the false identity. The higher the fraudulent credit score, the larger the loans that the defendants could obtain. These loans were never repaid, and the defendants reaped the profits. The defendants engaged in numerous frauds to run up loans. Presented below are examples of credit card fraud.

### Credit Card Fraud

20. The Co-Conspirators applied for numerous credit cards in the names of each false identity (the "Fraud Cards"). The majority of the Fraud Cards were applied for and/or managed online, many from the homes of the Co-Conspirators, including the homes of QAISER KHAN, KHAWAJA IKRAM, NASREEN AKHTAR and MOHAMMAD KHAN. In addition, the Co-Conspirators sometimes used the home addresses of its own members on applications for Fraud Cards, including the home addresses of BABAR QURESHI, MUHAMMAD SHAFIQ, QAISER KHAN, SHAFIQUE AHMED, HABIB CHAUDHRY, RAGHBIR SINGH, MUHAMMAD NAVEED, KHAWAJA IKRAM, NASREEN AKHTAR, MOHAMMAD KHAN, AZHAR IKRAM and SHAHID RAZA. The Co-Conspirators also used over 1,800 drop addresses they controlled throughout the United States as the addresses for the false identities.

21. In addition, the Co-Conspirators set up over 80 Sham Companies. The Sham Companies conducted little or no legitimate business. Instead, the Co-Conspirators used the Sham Companies to apply for credit card terminals, which in turn were used to run up charges on the Fraud Cards. In some instances, the purported owner of a Sham Company was one of the false identities created by the Fraud Enterprise. In other instances, the Co-Conspirators used their real names in connection with a Sham Company, including QAISER KHAN, SHAFIQUE AHMED, RAGHBIR SINGH and KHAWAJA IKRAM.

22. Members of the Fraud Enterprise received money into their personal bank accounts from the Fraud Cards either through a payment from one of the Sham Companies or directly from a false identity writing the defendants convenience checks, including checks made out to BABAR QURESHI, MUHAMMAD SHAFIQ, IJAZ BUTT, QAISER KHAN, SHAFIQUE AHMED, HABIB CHAUDHRY, RAGHBIR SINGH, MUHAMMAD NAVEED, KHAWAJA IKRAM, NASREEN AKHTAR, MOHAMMAD KHAN, AZHAR IKRAM and SHAHID RAZA.

23. BABAR QURESHI, MUHAMMAD SHAFIQ, IJAZ BUTT, QAISER KHAN, SHAFIQUE AHMED, HABIB CHAUDHRY, RAGHBIR SINGH, MUHAMMAD NAVEED, KHAWAJA IKRAM, NASREEN AKHTAR, MOHAMMAD KHAN, AZHAR IKRAM and SHAHID RAZA were involved in the credit card fraud scheme described above, through applying for Fraud Cards, charging Fraud Cards, and/or receiving payments from false identities and fake business. The following chart illustrates the extent of the involvement of these defendants in this aspect of the Fraud Enterprise. The chart is based on a review of a

sample of approximately 100 false identities controlled by the Fraud Enterprise and approximately 15 of the Sham Companies controlled by the Fraud Enterprise. The Fraud Enterprise, however, was much larger, with more than 7,000 false identities and more than 80 Sham Companies. Final confirmed loss numbers may be far higher than displayed in the chart on the following page.

| Defendant | Sample False Identities linked to Defendant[2] | Sample Fraud Cards linked to Defendant | Loss from Sample Fraud Cards linked to Defendant | Sample Sham Companies linked to Defendant[3] | Money received by Defendant from Sample Sham Companies linked to Defendant |
|---|---|---|---|---|---|
| QURESHI | 8 | 163 | $1,342,909 | 8 | $577,526 |
| SHAFIQ[4] | 12 | 464 | $2,588,381 | 2 | $33,484 |
| BUTT | 6 | 121 | $716,726 | 10 | $182,088 |
| KHAN | 7 | 90 | $358,571 | 7 | $1,128,284 |
| AHMED | 8 | 121 | $1,042,740 | 7 | $113,057 |
| CHAUDHRY | 18 | 206 | $1,153,000 | 12 | $222,544 |
| SINGH | 17 | 229 | $924,800 | 8 | $969,248 |
| NAVEED | 12 | 464 | $2,588,381 | 2 | $18,482 |
| IKRAM | 11 | 74 | $108,100 | 4 | $2,387,632 |
| AKHTAR | 7 | 298 | $845,295 | 5 | $30,950 |
| KHAN | 17 | 231 | $776,700 | N/A | N/A |
| IKRAM | 7 | 93 | $708,097 | N/A | N/A |
| RAZA | 10 | 149 | $1,238,740 | 7 | $67,396 |

---

[2]  For purposes of this chart, each Defendant listed is considered linked to a false identity if the false identity was added as a fictitious user on the Defendant's credit card; the Fraud Cards were applied for and/or managed from the Defendant's home; the Defendant's home address was listed as the address for the fraud card; the Defendant was recorded making a payment on a Fraud Card at a bank; the Defendant received money in the form of a convenience check issued from a false identity; or the Defendant received or sent emails or text messages containing fraudulent identification documents of a false identity or personal identifying information of a false identity. If a Defendant is linked to an identity, all Fraud Cards in the name of that identity are considered linked to the Defendant for purposes of this chart.

[3]  For purposes of this chart, each Defendant is considered linked to a Sham Company if the Defendant's name is used on any of the paperwork relating to the Sham Company, including bank accounts and merchant terminal accounts; the address of the Sham Company is the same as the Defendant's home; or the Defendant received money directly from the Sham Company.

[4]  MUHAMMAD SHAFIQ and MUHAMMAD NAVEED are brothers who lived at the same address and shared many of the same false identities.

## An Example: Asad Khan False Identity

24. The identity Asad Khan was made up by the Fraud Enterprise through the authorized user tradeline method discussed above. On or about May 7, 2011, CC-1 communicated via email to VERNINA ADAMS and instructed her to add an authorized user tradeline to Asad Khan's credit report to make it appear as if Khan was an authorized user for a Bank of America card with a $23,000 credit limit that was opened in March of 1993. A review of records from the Social Security Administration reveals that the personal identifying information provided by the Co-Conspirator for the identity Asad Khan does not match any existing individual.

25. A review of records from the credit bureaus reveals that the authorized user tradeline that CC-1 instructed VERNINA ADAMS to add to Asad Khan's credit report did in fact post to the report.

26. On or about May 16, 2011, CC-1 communicated via email to VERNINA ADAMS and instructed her to add a primary tradeline of $3,900 with Acapulco Jewelers to Asad Khan's credit report and to back date the tradeline to June of 2009.

27. A review of records from the credit bureaus reveals that the authorized user tradeline and primary tradeline that CC-1 instructed VERNINA ADAMS to add to Asad Khan's credit report did in fact post to the report. The authorized user tradeline and primary tradeline that VERNINA ADAMS added to Asad Khan's credit report increased the false identity's credit score considerably.

28. On or about June 17, 2011, an application for a USAA Credit Card in the name of Asad Khan—using the same identifiers that CC-1 provided to VERNINA ADAMS in or about May of 2011—was made from a computer located at Sham Company SK Restoration.

29. SK Restoration is a Sham Company operated by the Fraud Enterprise. SK Restoration purports to be a medical supply company, however, a review of SK Restoration's bank records reveals no purchases of medical supplies and no normal business expenses such as payroll.

30. Surveillance by law enforcement has identified defendants that frequent the business location for SK Restoration, including IJAZ BUTT.

31. A search of SK Restoration on or about August 31, 2012, uncovered numerous documents for many of the Sham Companies and false identities used by the Fraud Enterprise, including fake driver's licenses, more than 100 Fraud Cards, credit reports for false identities controlled by the Fraud Enterprise, and corporation documents for numerous Sham Companies.

32. Several email accounts used in furtherance of the Fraud Enterprise to traffic in fraudulent identification documents were accessed from computers located at SK Restoration. These email accounts transferred personal identifying information and fraudulent identification

documents for false identities to many of the defendants, including IJAZ BUTT, QAISER KHAN, SHAFIQUE AHMED, SHAHID RAZA and VERNINA ADAMS.

33. The USAA credit card for Asad Khan was then used to make numerous purchases, including two purchases on or about June 29, 2011, at complicit business Faros Travel. One purchase was for $9,871.60 and the other was for $9,276.40.

34. On or about September 28, 2011, USAA closed the Asad Khan credit card for nonpayment with total charges in excess of $20,000. No payments were ever made towards the balance of the Asad Khan USAA credit card.

35. Records from the credit bureaus reveal that false identity Asad Khan obtained 8 Fraud Cards in total with losses of approximately $28,000.

### An Example: Arif Afaq False Identity

36. The false identity Arif Afaq dates back to September of 2008 when it was generated by applying for a First Premier Bank card.

37. On or about September 12, 2010, MUHAMMAD SHAFIQ emailed personal identifying information for Arif Afaq to a Co-Conspirator ("CC-2") along with a line that read "Utility Bill." The email contained a social security number for Arif Afaq that, according to records from the Social Security Administration, actually belonged to a six-year-old boy with a different name.

38. On or about February 22, 2011, CC-2 received an email from Jersey Central Power and Light with a utility bill for Arif Afaq. The address that is listed for Arif Afaq is a drop address controlled by the Fraud Enterprise that is the purported home address for at least two false identities. The defendants would frequently use utility bills in the names of false identity's when applying for credit cards to substantiate the claimed home address of the false identity.

39. On or about September 19, 2010, CC-2 emailed MUHAMMAD SHAFIQ and attached a fraudulent driver's license for Arif Afaq.

40. On or about October 20, 2010, MUHAMMAD SHAFIQ emailed CC-2 personal identifying information for Arif Afaq along with a report number from one of the credit bureaus. When this report number is input into the website of the credit bureau it pulls up the identity's credit report, allowing the defendants to monitor the credit history of the false identity.

41. On or about December 16, 2010, CC-2 emailed VERNINA ADAMS and instructed her to add an authorized user tradeline to Arif Afaq's credit report. The date of birth provided to VERNINA ADAMS for Arif Afaq was the same as the date of birth on the fraudulent driver's license CC-2 emailed to MUHAMMAD SHAFIQ on or about September 19, 2010.

42. A review of records from the credit bureaus reveals that the authorized user tradeline that

CC-2 instructed VERNINA ADAMS to add to Arif Afaq's credit report did in fact post to the report. The authorized user tradeline that VERNINA ADAMS added to Arif Afaq's credit report increased the false identity's credit score.

43. A credit card issued by USAA in the name of Arif Afaq was opened on or about January 2, 2011.

44. On or about January 28, 2011, MUHAMAMD SHAFIQ emailed an account used by NASREEN AKHTAR and another co-conspirator ("CC-3") with personal identifying information for Arif Afaq. The social security number, date of birth and address provided in the email for Arif Afaq is the same as that was provided to CC-2 by MUHAMMAD SHAFIQ on or about October 20, 2010.

45. The USAA Arif Afaq credit card was then used to purchase more than approximately $13,000 in computer equipment in or about January and February of 2011.

46. On or about November 2, 2012, USAA closed the Arif Afaq credit card for nonpayment. No payments were ever made towards the balance of the USAA Arif Afaq credit card.

47. Records from the credit bureaus reveal that approximately 14 Fraud Cards were obtained based on the false identity Arif Afaq, with total losses of approximately $52,000.

**Complicit Businesses**

48. The Fraud Enterprise also relied upon complicit businesses to extract money from the Fraud Cards. The complicit businesses would allow the defendants to conduct sham transactions on the Fraud Cards and would then receive the proceeds from the credit card companies and split them with the other members of the Fraud Enterprise. SAT VERMA, VIJAY VERMA, TARSEM LAL, and VINOD DADLANI operated jewelry stores that furthered the conspiracy in the following ways:

    a. Ashu Jewels (owned by SAT VERMA), Tanishq Jewels (owned by VINOD DADLANI) and Raja Jewelers (owned by TARSEM LAL and VIJAY VERMA) all maintained multiple credit card merchant processing accounts at the same time. By operating dozens of accounts, these businesses furthered the conspiracy by allowing more fraudulent transactions to be processed before the merchant processors shut down the account. Ashu Jewels, Tanishq Jewels, and Raja Jewelers all had terminals in alternate business names and using contact names of numerous people other than the actual owners of the jewelry stores. Most of the merchant accounts operated by the jewelry stores have been closed due to fraud.

    b. The proceeds from these merchant terminals were then deposited into a multitude of different business checking accounts. The money in these accounts was then paid out to SAT VERMA, VIJAY VERMA, TARSEM LAL, and VINOD DADLANI and others to purchase large amounts of gold jewelry.

49. From in or around June 2008 to in or around January 2009, more than 95% of the charges on one of the Raja Jewelers merchant terminals were fraudulent and related to the Fraud Enterprise. The total amount processed in fraud just through this one terminal during this eight month span was approximately $386,000.

50. From in or around January 2008 to in or around August 2008, more than 92% of the charges at just one of the Ashu Jewels merchant terminals were fraudulent and related to the Fraud Enterprise. The total amount processed in fraud just through this one terminal during this time frame was approximately $344,000.

51. From in or around July 2008 to in or around December 2008, more than 69% of the charges at two of the Tanishq Jewels merchant terminals were fraudulent and related to the Fraud Enterprise. The total amount processed in fraud just through these two terminals during this time frame was approximately $325,000.

52. In or around April of 2011, court authorized search warrants were executed at Ashu Jewels, Tanishq Jewels, and Raja Jewelers. During these searches, investigators found further evidence relating to the Fraud Enterprise, including credit cards at Tanishq Jewels and Raja Jewelers in the names of false identities used by the Fraud Enterprise.